**Warren H. DAVIS, Plaintiff,**

v.

**INGERSOLL JOHNSON STEEL COMPANY, INC., Defendant.**

**No. IP 82–793–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 28, 1985.

**2.** In *Agis*, a restaurant manager fired waitresses in alphabetical order in attempt to discover a dishonest employee.

Raymond J. Hafsten, Jr., Indianapolis, Ind., for plaintiff.

William P. Wooden, Indianapolis, Ind., Michael C. Towers, Benjamin B. Culp, Jr., Atlanta, Ga., for defendant.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

This case came before the Court for trial on November 2, 1984. For the following reasons, judgment will be entered in favor of the plaintiff and damages will be awarded in the amount of $11,987.66 plus costs.

### Background

This case was initiated by the plaintiffs against the defendant alleging a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* The present trial concerned only the alleged wrongful discharge of plaintiff, Warren H. Davis, from his employment as a security guard for defendant Ingersoll Johnson Steel Company, Inc. (hereafter Ingersoll Johnson).

Davis was employed in a variety of positions with Ingersoll Johnson from 1945 to 1981 with the exception of eight years, from 1959 to 1967, when Davis was granted leave to act as Sheriff of Henry County. Prior to Davis's term as Sheriff, he worked in various positions within the union bargaining unit, accumulating 21 vested years of seniority in the unit. Upon seeking rehiring in 1967, Davis was offered and accepted a management position as assistant foreman in shipping and receiving.

Davis remained in a supervisory position, with no complaints about his job performance until 1971. At that time, Ingersoll Johnson's cold rolling facility was closed and Davis was asked if he would accept a position in plant protection. He accepted the job and worked as a security guard on the second (evening) shift for the next 10 years. Davis's duties as security guard included checking all personnel entering and leaving the plant, picking up bills of lading for after hours deliveries, and performing periodic safety inspections of the plant.

Throughout Davis's employment at Ingersoll Johnson, he received regular salary increases and was not criticized in his job performance except in December, 1980. On a performance appraisal dated December 15, 1980, Davis was rated lower than he had been in the past by Roy Bovender, a personnel assistant. Davis testified that he protested the low rating and that Bovender told him he had done only what he was told to do and that he had rated all of the security guards alike. The evidence showed that Davis's name appeared on a list of "Possibles" compiled in August 1980 by the company president, Grant John, which list contained the names of older employees who were eligible for retirement, many of whom were ultimately discharged by the end of 1981.

In late summer and fall of 1981, Ingersoll Johnson suffered a business downturn which continued through 1982 and required a reduction in the company's work force. On November 19, 1981, at age 60, Davis was notified of his impending termination and was offered early retirement. Davis objected to this action by the company and requested a transfer to another supervisory position or a position within the bargaining unit for which he was qualified. He was refused both. Davis was terminated effective November 30, 1981 and ultimately, in July, 1983, he elected early retirement to obtain needed medical insurance and other benefits.

Ingersoll Johnson's president, Grant John, testified that as part of the November, 1981 reduction in force, management decided to utilize the security guard jobs as "holding" positions to retain more valued employees whose skills might be needed if business improved or who could perform other functions while also doing security guard duties. Three of the four security guards then employed by Ingersoll Johnson were replaced in November, 1981. E.M. Poynter, age 56, was retained as a guard and the three replacement guards were Roy Bovender, age 61; Phillip Orr, age 52; and Don Wallace, age 30. Bovender had previously been a guard before moving to the position of personnel assistant and could perform some of his personnel assistant duties during idle time as a guard. Orr had been a rolling mill supervisor and was retained in anticipation of a future need for his skills in that area. Wallace had been employed at Ingersoll Johnson for only six months as a receiving clerk. Wallace was retained to perform receiving clerk duties during idle time as a security guard.

Davis showed that he had prior supervisory experience in the shipping and receiving department and had performed some receiving clerk duties as a part of his duties as security guard. Davis also presented evidence that his name appeared on a second list of employees who were targeted for termination or retirement which was compiled in November, 1981. Wallace and Orr were also on this list but were not terminated.

In May, 1982, Orr was moved back to his former position as rolling mill supervisor. As a guard, Orr had been on the third (overnight) shift. Davis was offered reinstatement as a guard to fill this vacancy but Davis refused the offer because he could not work the third shift because of family circumstances.

In a prior trial in this case, involving separate plaintiffs, statistical evidence was presented showing that a greater percentage of Ingersoll Johnson's older employees were terminated in 1981. Further evidence at the prior trial disclosed that company managers stated that they wanted "young and aggressive" and "youthful, hard hitting employees," and that older employees should be terminated to make way for younger blood. The evidence presented at the prior trial was stipulated into evidence in the Davis trial.

### Discussion

In an age discrimination case, the plaintiff has the ultimate burden of proving that he was discharged because of his age. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). To meet this burden, the plaintiff must show that his age was "a determining factor" in the defendant's decision to terminate him. *Id.; Golomb v. Prudential Insurance Co.*, 688 F.2d 547 (7th Cir. 1982). The plaintiff need not show that his age was the sole motivating factor in the termination decision but he must be able to show that the defendant would not have discharged him "but for" its motive to discriminate against him due to his age. *La Montagne v. American Convenience Products, Inc., supra; Golomb, supra.* The plaintiff may prove discrimination directly, by presenting direct or circumstantial evidence, or he may prove his claim indirectly, through the use of the standard set forth and explained in the two United States Supreme Court cases of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Tex-*

as *Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *La Montagne v. American Convenience Products, Inc.*, *supra*, at 1409. Under the *McDonnell Douglas* or *Burdine* standard, as stated by the Seventh Circuit Court of Appeals in *La Montagne*, the plaintiff must first "prove a prima facie case of discrimination, by showing (1) that he was in the protected class, (2) that he was doing his job well enough to meet his employer's legitimate expectations, (3) that in spite of his performance he was discharged, and (4) that the employer sought a replacement for him." 750 F.2d at 1409. The Court of Appeals noted with regard to the second factor listed above that in discriminatory *hiring* cases, the plaintiff would be required to show that he was qualified for the job but that in *termination* cases, the plaintiff's job performance was the appropriate measure of his qualification for the position.

■ If the plaintiff is successful in establishing a prima facie case, a rebuttable presumption of discrimination arises and the defendant then has the burden of articulating lawful reasons for the discharge. *Id.* at 1409. The burden of persuasion, however, remains at all times on the plaintiff. If the defendant sets forth lawful reasons for the discharge, the plaintiff must prove that the proffered reasons are a mere pretext for discrimination. *Id.*

■ In the present case, the plaintiff, Davis, showed that his name appeared on a possible termination or retirement list as early as August, 1980, that he was performing his job satisfactorily until he received a low performance rating in December, 1980 by Bovender, who was only "doing what he was told to do;" that his name also appeared on a termination/retirement list prepared in the fall of 1981 along with the names of other employees who were not ultimately separated from the company including Don Wallace and Phillip Orr; and that a disproportionate percentage of older employees were separated from the company in 1981. Not only is this direct evidence highly suggestive that age was a determining factor in the decision to terminate Davis, but Davis has otherwise clearly met his burden of proving age discrimination under the *McDonnell Douglas* standard.

Davis showed that at age 60 he was in the protected class, that he was meeting his employer's legitimate expectations as a security guard, that in spite of his performance he was discharged, and that he was replaced.

Ingersoll Johnson attempted to show a legitimate business reason for terminating Davis by showing that a severe business downturn necessitated a reduction in force in November, 1981 and that more valuable employees were moved into the three guard positions. Nevertheless, Davis showed that he was targeted for termination as early as August, 1980, that he received a low performance rating upon orders of Ingersoll Johnson management, that he was qualified to perform the duties of receiving clerk which were performed by Wallace after Wallace's move to the security guard position, and that a disproportionate number of older employees were selected to be terminated in the reduction of force. The evidence shows that Ingersoll Johnson considered terminating Davis as an older employee prior to the business downturn in November, 1981 and continued to terminate older employees over younger employees in its decisions regarding work force reductions. Therefore, Davis has met his burden of showing that Ingersoll Johnson's proffered business reasons for terminating the plaintiff are a mere pretext and that age was a determining factor in the decision to terminate him.

■ In the event liability on the part of Ingersoll Johnson was found, the parties stipulated to the amount of damages incurred by the plaintiff with the exception of certain issues. Ingersoll Johnson argues that the calculation of damages should be made only from the date of Davis's termination on November 30, 1981 through the date the company offered to reinstate the plaintiff to a guard position on May 15, 1982. Although the offer of reemployment was vague as to what shift

Davis would work, the offer was for reinstatement to a security guard position. The record shows that when Davis was employed as a security guard, he could have been transferred to another shift at any time. The offer for any shift, therefore, constituted an offer of reemployment to Davis's original position or to a substantially similar position.

The United States Supreme Court, in *Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), found that an unconditional offer of employment to the plaintiff's original position or to a substantially similar position would toll the accrual of back pay liability. *Id.* at 232, 102 S.Ct. at 3065–66, 73 L.Ed.2d at 732–33. Ingersoll Johnson's offer to Davis was unconditional. He would not have forfeited his claims with regard to this lawsuit if he had accepted the proffered employment. Therefore, Ingersoll Johnson's offer of May 15, 1982 effectively tolls the accrual of back pay liability to Davis, and damages accordingly will be calculated to that date.

■ The stipulated damages, calculated through May 15, 1982, include back wages of $8,531.95 and lost pension benefits of $2,513.68. In addition, we find that he should recover medical bills of $965.27 incurred during such period. But for his termination said bills would have been covered by the defendant's group insurance policy.

■ Lastly, a dispute exists as to whether the plaintiff's income as a bail bondsman following his termination should be applied to reduce his damages from loss of wages. We think not. Davis operated his bail bonding business from his home as a part-time job both before and after his separation from Ingersoll Johnson. The income from his bail bonding did not increase following his termination from the company in November, 1981. Davis would have earned the income from that business during the years 1981 and 1982 regardless of his employment status at Ingersoll Johnson. Therefore, the income from Davis's bail bonding business will not be deducted from the back pay liability of Ingersoll Johnson.

Judgment will therefore be entered for the plaintiff in the amount of $11,987.66, plus attorneys fees and costs. We do not find the defendant's violation of the ADEA to have been willful. The parties are directed to attempt agreement as to the attorneys fees, but in any event plaintiff's claim for such fees must be filed within 30 days if no agreement is reached.